UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Karen Mead, | ) | Docket No. _____ |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| FairPoint Communications, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

### Parties

1. The Plaintiff, Karen Mead, resides at 69 King Road, Bedford, New Hampshire 03110.

2. Defendant, FairPoint Communications, Inc. (hereinafter "FairPoint"), is a Delaware corporation with a principal place of business at 521 East Morehead Street, Suite 500, Charlotte, NC 28202. FairPoint's Registered Agent is CT Corporation System, 9 Capitol Street, Concord, NH 03301.

3. At all times relevant hereto, Defendant has engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

4. Ms. Mead's claims arise under Title VII, 42 U.S.C. 2000(e) *et seq.*, and New Hampshire N.H. RSA 354-A.

5. On or about April 1, 2014, Ms. Mead filed a Charge of Discrimination and Retaliation (hereinafter "Charge") with the New Hampshire Human Rights Commission and the Equal Opportunity Commission, in accordance with the requirements of 42 U.S.C. §12101 *et*

*seq*. On or about April 15, 2014, Ms. Mead filed an Amended Charge of Discrimination and Retaliation to identify New Hampshire as the state in which she was employed for FairPoint. On or about February 12, 2015, Ms. Mead filed a Second Amended Charge of Discrimination and Retaliation alleging further and continued discrimination and retaliation by FairPoint.

6. Ms. Mead's Charges were filed with the New Hampshire Human Rights Commission and the Equal Employment Opportunity Commission within 180 days after the unlawful employment acts were committed.

7. On or about July 6, 2015, more than 180 days having elapsed since the filing of the Charge, the Equal Employment Opportunity Commission issued Ms. Mead a Notice of Right to Sue with respect to her Charge, thus satisfying the procedural prerequisites established by 42 U.S.C. §12101, *et seq*. (*See* Exhibit A, Notice of Right to Sue, attached hereto and incorporated herein by reference).

8. This Complaint is filed less than 90 days after receipt of the Notice of Right to Sue, dated July 6, 2015 (as attached).

**Jurisdiction and Venue**

9. The Court has jurisdiction over this case because some of the Plaintiff's claims arise under the federal statute, Title VII.

10. New Hampshire is an appropriate venue pursuant to 42 USC 2000(e)-5(f)(3) as the majority of the unlawful acts took place in New Hampshire.

**Facts**

11. Ms. Mead began her full-time employment with FairPoint on April 1, 2008, preceded by 25 years with Verizon.

12. Ms. Mead performed well throughout her employment with FairPoint.

13. Throughout Ms. Mead's employment with FairPoint, she worked at 770 and 900 Elm Street, Manchester, New Hampshire 03101. Ms. Mead served as the Vice President of Engineering and Operations for Northern New England and, subsequently, as the Senior Vice President of Operations for Northern New England.

14. Ken Amburn was hired by FairPoint as the Executive Vice President for Operations in or about October, 2010. At that time, he became Ms. Mead's immediate supervisor.

15. Shortly after Mr. Amburn joined FairPoint, he began to make inappropriate gender-based statements in the workplace.

16. By way of example, in or about June, 2011, he and Ms. Mead were having a discussion about forming a Workforce Management Center, and when Ms. Mead asked him to define the model he wanted to employ for such a center, he said, "A girl ran my first Workforce Management Center for me," and then added, as if surprised, "She did a good job."

17. In or about July, 2011, Mr. Amburn reorganized teams working for him and took the Network Operations Center (NOC) and Data Services Center (DSC) functions away from Ms. Mead's team and gave both functions to Steven Rush.

18. When Ms. Mead questioned his decision, Mr. Amburn's response was that Mr. Rush had NOC experience. Ms. Mead responded that she had a lot of NOC experience. Mr. Amburn told Ms. Mead that he saw the NOC as chaotic and not having the right tools after his one very brief visit to the NOC. At the time of this decision, Ms. Mead believes she had significantly more education and as much experience as Steve Rush (and she continues to have more education and as much experience as Steve Rush).

19. Steve Rush was empowered to hire people in the NOC and to change out the Network Monitoring System back to the superior Verizon system.

20. In or about December, 2011, Ms. Mead participated in three interviews with Mr. Rush and Mr. Amburn to find a Director of Training. During one interview with a female interviewee, Mr. Amburn inappropriately asked the interviewee, "Do you have any children?" The interviewee responded that she did not, but it was apparent that she was uncomfortable with Mr. Amburn's unlawful question. The interviewee was offered the job, but declined. It was upsetting to Ms. Mead and very inappropriate that the female interviewee was asked this blatantly gender-based question.

21. Also in December, 2011, Mr. Amburn called Ms. Mead and said he wanted to meet with her the next day to give her "fatherly advice in regards to style and management."

22. Also in December, 2011, at a reception in Vermont concerning cleanup from Hurricane Irene, Mr. Amburn interacted only with Dan Pouliot and Scott Aubrey, while completely ignoring Ms. Mead.

23. As a result of the foregoing, on or about December 16, 2011, Ms. Mead met with Shirley Linn, FairPoint's General Counsel, to report her concerns about Mr. Amburn's conduct. During that discussion, Ms. Mead reported the issue with the Vermont event, the "fatherly advice" comment, and her concerns with ongoing disparate treatment toward her as compared to her male peers and subordinates.

24. During the first week of January, 2012, Mr. Amburn arrived at the Manchester office mid-day, and the only thing he said to Ms. Mead was, "Where's Lunny?" (Ms. Mead's peer, John Lunny).

25. At a meeting during the last week of February, 2012, Mr. Amburn commented that he "might even hire an African American man." This comment was made completely out of context and was not relevant to the discussion.

26. At a meeting in mid-May, 2012, Mr. Amburn discussed an ATT meeting which Steve Rush and Ms. Mead attended. He noted that ATT Vice President Steve Huels saw FairPoint as "best in class" and acknowledged Steve Rush's contribution. Mr. Amburn never stated that Ms. Mead, too, had been at the meeting (and her team had built all of the infrastructure for ATT's northern New England cell tower project). Also during that mid-May, 2012 meeting, Mr. Amburn credited Steve Rush with improvements in MTTR, but said nothing about Ms. Mead's team's contribution toward those improvements in MTTR.

27. The day after that mid-May, 2012 meeting, Mr. Amburn and Mr. Sunu, FairPoint's CEO, played golf for the day with Steve Rush and John Lunny.

28. Two days after the golf outing, Mr. Amburn and Mr. Sunu conducted an Operations Review with all Senior Leaders. John Lunny and Steve Rush were credited with the MTTR improvements by Mr. Sunu. Ms. Mead discussed the comments crediting John Lunny and Steve Rush with Mr. Amburn, and told him that she and her team were not getting credit for contributions that led to MTTR improvements. Mr. Amburn listened, but did not respond in any way.

29. Beginning in June, 2012, Mr. Amburn started calling Steve Rush very early every morning to "check in." Mr. Amburn never had any similar consistent "check ins" with Ms. Mead.

30. At the end of July, 2012, Mr. Amburn and Mr. Lunny were in Portland, Maine working together for three days, and had dinner together every night. Although Ms. Mead was involved in meetings with them during the day, she was never invited to their dinners.

31. In early September, 2012, Ms. Mead attended a budget/headcount meeting with Mr. Amburn and Jeff Richards, one of her direct reports. During the meeting, Mr. Richards mentioned that his wife works. Mr. Amburn responded, "Why does your wife work?" Mr. Richards then responded that his wife likes working and does very well. Mr. Amburn replied, "My wife stayed home and had two sons to raise."

32. By mid-September, 2012, Mr. Amburn continued to exclude Ms. Mead from various meetings and dinners. By way of example, she was excluded from interviewing the Contingency Planning candidate, despite the fact that she was responsible for 80% of the Union personnel at FairPoint and had experience with contingency planning. Instead, Mr. Amburn conducted the interview. At that time, Ms. Mead again spoke to FairPoint's General Counsel, Shirley Linn. Ms. Linn suggested that she understood Ms. Mead's position and had witnessed some of what she was reporting, and had discussed it with the Executive Team. Ms. Linn also indicated that she had recommended executive-level training regarding sexism. Finally, she suggested that Ms. Mead schedule weekly calls with Mr. Lunny and Mr. Rush, to be sure she was kept up to date on company matters.

33. In early November, 2012, Mr. Amburn told Ms. Mead that two of her very experienced Directors needed "to go." It was the first Ms. Mead had heard of what appeared to be a final decision by Mr. Amburn concerning two of Ms. Mead's direct subordinates. Ms. Mead expressed her concerns to Mr. Amburn that he did not appear to value her input and opinions, and told him that he treated her very differently from her peers. Ms. Mead specifically

6

asked Mr. Amburn whether the differing treatment was because she was a former Verizon employee, or because she was female.  Ms. Mead specifically told him that his treatment of her was having an impact on her team and the business, and that in her 30-year career, she had never felt this way.  Mr. Amburn denied having any issues with Ms. Mead's work performance, told her that he wanted her to enjoy her job, and at several different points during the conversation, talked about Ms. Mead being created in God's image.

34.     The next day, Mr. Amburn called Ms. Mead and tried to start another discussion about how much experience he had, and she reiterated that she believed he had no regard for her opinions on matters involving FairPoint.  That day, Mr. Lunny commented to Ms. Mead "it is clear that you two don't get along and haven't for the past year."  Mr. Lunny's statement was false.  Ms. Mead's issues with Mr. Amburn did not have to do with whether they "got along."

35.     On November 14, 2012, Ms. Mead sent a written complaint to Ms. Linn regarding Mr. Amburn's disparate treatment toward her.  Two days later, on November 16, 2012, Ms. Linn told Ms. Mead that her complaint would be handled very confidentially.  Despite that, shortly thereafter, Mr. Rush told Ms. Mead that Mr. Amburn had asked him, "Do you work well with me?"

36.     On November 19, 2012, Ms. Linn contacted Ms. Mead concerning her written complaint and said that Mr. Sunu, CEO of FairPoint, and Greg Castle, Human Resources/Labor Executive Vice President, knew of her complaint, and had been told not to talk to anyone about it.  Ms. Linn asked Ms. Mead if Mr. Amburn had discussed her proposed alternative staffing plan, and Ms. Mead responded that Mr. Amburn had not accepted her input.  Later that day, Mr. Amburn called Ms. Mead and told her that he cared about FairPoint and accepted her staffing proposal, and told her that he did respect her and what she did at FairPoint, and stated that he

was her mentor. Ms. Mead acknowledged to Shirley Linn by e-mail that Mr. Amburn had accepted her staffing proposal, and Ms. Mead requested that Ms. Linn communicate to the Senior Leadership Team that they lead by example and be respectful and professional at all times.

37. In mid-February, 2013, Mr. Amburn had a teamwork call in which Ms. Mead was involved. During the meeting, he made specific reference to both Mr. Lunny and Mr. Rush and other male managers, but never made any reference to Ms. Mead or the Operations Team under her.

38. In late April, 2013, Mr. Amburn called Ms. Mead regarding a work situation and asked her to "think about this while you are doing your housework this weekend." This comment was extremely sexist, and Ms. Mead related this comment to Shirley Linn informally.

39. In mid-May, 2013, Mr. Amburn called Ms. Mead from Charlotte to tell her that he had forgotten his toiletries kit at the Radisson Hotel, and asked her to go pick it up for him and then send it to him via Fed Ex. Ms. Mead does not believe that Mr. Amburn would ask a male executive to perform such a minimal task.

40. In mid-August, 2013, Ms. Mead met with two female outside Plant Techs in West Lebanon, New Hampshire, and listened to their complaint of sexual harassment by their supervisor. The matter was investigated, and the supervisor resigned. Ms. Mead changed the women's assignments to take them out of the contaminated work environment. Ms. Mead kept Mr. Amburn informed of this very sensitive matter, but when she would try to discuss it with him, he showed little to no interest and only commented that he was concerned that the Company have no liability.

41. In October, 2013, the Operations Team held a golf outing. Mr. Amburn attended the outing. Following the outing, there was a dinner attended by approximately 60 people. During the dinner, Mr. Amburn repeatedly thanked "John and Steve" (John Lunny and Steve Rush) and their teams, but never thanked Ms. Mead or her team.

42. On October 9, 2013, Mr. Amburn met with Ms. Mead to present his reorganization plan to her. In the reorganization, Ms. Mead was to be responsible for the State of New Hampshire and company facilities. He told her that she would be providing Customer Service. Ms. Mead asked if she was being demoted, and Mr. Amburn denied that she was, saying that the reorganization would allow for a focus on Customer Service. The next day, Ms. Mead proposed to Mr. Amburn that she continue to be responsible for Field and Central Office synergies. Ms. Mead did not hear back from Mr. Amburn about her proposal until October 16, 2013, when he told her that he was not making any changes but, rather, was doing the reorganization "his way."

43. During the October 16th call, Ms. Mead told Mr. Amburn (among other things) that she thought that his reorganization was demeaning and disrespectful to her and her skills and education. She told him that he had blown up her organization, and he responded that he had flattened the organization. Ms. Mead asked whether this was a work performance issue, and he said that it was not. Ms. Mead expressed her concerns with the fact that Mr. Amburn did not talk to her and made unilateral decisions, and gave him examples. Mr. Amburn responded that he ran all of his changes by the Executive-Level Team. Ms. Mead then suggested that she take Mr. Rush's job and that Mr. Rush manage New Hampshire. Mr. Amburn quickly replied "no," and stated, "Steve has NOC experience." In fact, Ms. Mead has years of NOC experience at every level. Ms. Mead indicated to Mr. Amburn that she would not be resigning, if that were the intent

9

of his reorganization, and asked that he convey that same information to FairPoint executives in Charlotte.

44. The same day, October 16th, Ms. Mead e-mailed Ms. Shirley Linn and requested to speak with her. Ms. Linn called Ms. Mead and was very cool to her (whereas previously she had appeared to be sympathetic to the issues Ms. Mead had raised to her concerning Mr. Amburn). During the call, Ms. Linn told Ms. Mead that she did not want to see another piece of paper come across her desk on this, which was a clear indication that she did not want Ms. Mead to raise a further internal complaint of gender discrimination by Mr. Amburn. Ms. Mead thanked her, and ended the call.

45. Within a week, Bruce Ballantyne, a Director in Maine (formerly Ms. Mead's direct report), called Ms. Mead and told her that Mr. Rush had told him that he is really "in charge," signaling that Mr. Rush fully recognized that Ms. Mead had been demoted and that he had been promoted.

46. On October 22, 2013, Mr. Paul Sunu, FairPoint CEO, asked Ms. Mead to step out of a meeting they were attending. He brought Ms. Mead into a public lobby at the Radisson and said, "I know you are disappointed about the reorganization." Ms. Mead told him that she felt demeaned and disrespected, given her education, years of experience, and the work she had done for FairPoint to build a network and motivate the Operations Team. Ms. Mead told him that Mr. Amburn had given her no reason other than stating that he was flattening the organization. Mr. Sunu suggested that the communication may have been done incorrectly and he said he was getting a lot of pressure from the Board of Directors. He also added that this actually gave Mr. Amburn more work to do.

47. On October 25th, Mr. Amburn called Ms. Mead and told her that she got the "crud." There was no business discussion other than asking about the weather.

48. On November 13, 2013, it was relayed to Ms. Mead that Mr. Rush had said, "Karen needs to play or Charlotte will have their way with her."

49. On December 11, 2013, in a discussion with Steve Rush, Mr. Rush said to Ms. Mead that he "[didn't] know how [she was] handling the job change." He went on to say that he would not have been able to deal with it. This further confirms that Mr. Rush and others saw the October reorganization as a demotion for Ms. Mead.

50. Mr. Amburn discriminated against Ms. Mead, subjected her to a hostile environment, and demoted her because of her gender.

51. Ms. Amburn's demotion of Ms. Mead has tarnished her professional career.

52. Steven Rush and John Lunny, Ms. Mead's male peers who have far less education and experience than Ms. Mead, were promoted by Paul Sunu, CEO with the full support of Ken Amburn, while Ms. Mead was demoted.

53. On January 14, 2014, Ms. Mead sent a letter to Helio Medina, a Human Resources Representative for FairPoint, detailing the gender discrimination, hostile environment, and discriminatory demotion to which she was subjected to FairPoint.

54. In response, FairPoint retained Attorney Jennifer Moeckel to investigate Ms. Mead's claims.

55. Ms. Mead met with Attorney Moeckel on February 5, 2014, and February 7, 2014, for a total of nine hours (between both meetings) concerning her complaint. Attorney Moeckel indicated to Ms. Mead that she might need to meet with her again at the end of her investigation.

56. After Ms. Mead sent the letter to Mr. Medina detailing the gender discrimination, hostile environment and discriminatory demotion to which she was subjected at FairPoint, Mr. Amburn largely stopped consulting with Ms. Mead on business matters relating to her job duties.

57. Although Mr. Amburn began calling Ms. Mead more frequently, it was rarely on a business-related matter.

58. In addition, Mr. Rush significantly lessened his communication with Ms. Mead on business-related matters since her letter to Mr. Medina.

59. Mr. Rush and Mr. Amburn retaliated against Ms. Mead after she sent the letter to Mr. Medina, in retaliation for her complaint, as expressed in that letter.

60. On March 19, 2014, Mr. Amburn informed Ms. Mead of "major tour changes" for the field personnel and did not want any input from her, but rather, obtained input from Mr. Rush.

61. As stated above, Ms. Mead filed a Charge with the New Hampshire Human Rights Commission alleging gender discrimination, hostile environment and retaliation ,on April 1, 2014.

62. On April 16, 2014, Ms. Mead received a letter from Susan L. Sowell, FairPoint's Senior Vice President and Assistant General Counsel, telling her that FairPoint took her internal complaint of discrimination seriously, that FairPoint hired outside counsel Attorney Jennifer Moeckel to investigate her complaint, and that Attorney Moeckel concluded that the investigation did not reveal support for her allegation of gender discrimination.

63. On December 29, 2014, the CEO of FairPoint, Paul Sunu, issued a memorandum announcing that Mr. Amburn was leaving Fairpoint ("In conjunction with this reorganization Ken Amburn, Executive Vice President, Operations, will leave the company on January 26, 2015

following a structured transition"), and that Mr. Rush was appointed as his successor, with the title of Senior Vice President, Northern New England Operations.

64. The memorandum also stated that "Steve will retain his previous direct reports and Bruce Ballantyne, Karen Mead, Dan Pouliot, Jeff Richards, Mary Peters, and Tim Burns will now report directly to him."

65. On January 14, 2015, Steve Rush sent a memorandum to all FairPoint employees announcing the promotions of his male buddies, Bryan Lamphere, Tim Burns, John Stone, and Wayne Lechlider. There were no formal interviews held for any of these job promotions. The Construction responsibilities were removed from Bruce Ballantyne, Dan Pouliot, and Ms. Mead, further reducing Ms. Mead's responsibilities. Construction responsibilities were reassigned to Jeff Richards, who was not promoted.

66. The memorandum also stated "Bruce Ballantyne, Karen Mead and Dan Pouliot will continue to manage all responsibilities related to NNE Installation and Maintenance and will report to me." Mr. Rush also had a staff meeting call on January 13, 2015, and told all of his new direct reports that they all had a "seat at the table."

67. On February 2, 2015, Ms. Mead met with Michael Reed, the FairPoint President for the State of Maine, who told her that she was being moved into the position of Senior Vice-President of External Relations and Community High Speed Internet Development. Mr. Reed told Ms. Mead, "I've been told that you have been transferred into this job." Ms. Mead told Mr. Reed that she believed the move was in retaliation for action she had taken against the company.

68. On February 3, 2015, Mr. Reed sent a memorandum to all FairPoint employees announcing Ms. Mead's new position.

69. Upon information and belief, this was a newly created position. Ms. Mead's appointment to the position took her completely out of her field of expertise in Operations of FairPoint and was properly viewed as a demotion (despite no pay level or salary change), and limited Ms. Mead's opportunities for advancement at FairPoint or at other companies.

70. After Ms. Mead heard from Mr. Reed on February 2nd, she called Mr. Rush, and he simply stated "I got wind of something happening on Friday," as if he had not had anything to do with Ms. Mead being moved entirely out of FairPoint Operations. Clearly, Mr. Rush had to have been involved in the decision made completely behind Ms. Mead's back to have her moved out of Operations. Mr. Rush subsequently announced that another of his buddies, Richard Murtha, would be taking over as the Installation and Maintenance VP in NNE effective immediately, a job Ms. Mead was removed from in October of 2013, for no reason.

71. Ms. Mead always had satisfactory or excellent performance at FairPoint, and continued to have excellent performance since filing her original Charge and Amended Charge with the New Hampshire Human Rights Commission, in April, 2014. Most recently, Ms. Mead received her 2014 MBO sign off for bonus potential. The bonus is given under a plan called MBO ("Management by Objective") under which her performance was ranked. Ms. Mead was ranked at 98.5% out of 100%. The bonus was signed by Ms. Mead's Manager, Steve Rush.

72. Ms. Mead was subjected to further discrimination and retaliation by FairPoint when: (a) it did not consider her for Mr. Amburn's position, which she is more qualified to perform than Mr. Rush and which, upon information and belief, pays significantly more than she currently earned at FairPoint; and (b) when it demoted Ms. Mead into the position of Senior Vice-President of External Relations and Community High Speed Internet Development, which entirely removed her from Operations at FairPoint.

73. As a result of the unlawful gender discrimination described herein, and the retaliation to which Ms. Mead was subjected since first sending a letter of complaint to Mr. Medina, and since filing a Charge (and Amended Charge) with the New Hampshire Human Rights Commission in April, 2014, Ms. Mead was constructively terminated from her job at FairPoint as of March 24, 2015.

74. The treatment to which Ms. Mead was subjected, as described throughout this complaint, was so severe and intolerable that any reasonable person would have resigned from their employment. *Karch v. BayBank FSB*, 147 N.H. 525 (2002); *Porter v. City of Manchester*, 151 N.H. 30 (2004); *Lacasse v. Spaulding Youth Center*, 154 N.H. 246 (2006);

75. As a result of FairPoint's treatment of Ms. Mead, as described in this Complaint, Ms. Mead has suffered, and continues to suffer, emotional and financial harm.

76. In addition, FairPoint's treatment of Ms. Mead, as described in this Complaint, has caused, and continues to cause, harm to Ms. Mead's earning potential and career advancement, and irreparable damage to her credibility and reputation as a senior professional in the telecommunications industry.

## Count I – Gender Discrimination – N.H. RSA 354-A

77. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

78. As described above, Ms. Mead was subjected to discrimination on the basis of her gender by FairPoint.

79. Ms. Mead's demotion on October 9, 2013, by FairPoint was based upon her gender.

80. As described above, Ms. Mead was further subjected to discrimination on the basis of her gender by FairPoint when when FairPoint completely failed to consider her for (and therefore, failed to hire her into) Mr. Amburn's position, which she is more qualified to perform than Mr. Rush and which, upon information and belief, pays significantly more than she was earning at FairPoint.

81. As described above, Ms. Mead was further subjected to discrimination on the basis of her gender by FairPoint when FairPoint demoted Ms. Mead into the position of Senior Vice-President of External Relations and Community High Speed Internet Development, which entirely removed her from Operations at FairPoint.

82. As a result of all of the conduct alleged in Ms. Mead's Complaint, she was constructively discharged from her position with FairPoint on March 25, 2015.

83. All of FairPoint's unlawful employment practices as described herein violated N.H. RSA 354-A:7, I.

84. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count II – Gender Discrimination– Title VII

85. Ms. Mead re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

86. As more particularly described in Count I above, FairPoint willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by taking each of the adverse employment actions described in Count II against Ms. Mead on the basis of her gender.

16

87. As a direct and proximate result of FairPoint's violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

**Count III – Gender-Based Harassment/Hostile Environment – RSA 354-A**

88. Ms. Mead re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

89. As described throughout Plaintiff's Complaint, Ms. Mead was subjected to repeated offensive comments regarding her gender by management-level employees, including, but not limited to, her immediate supervisor, Mr. Amburn, at FairPoint.

90. The repeated offensive comments were based on Ms. Mead's gender.

91. The repeated offensive comments regarding Ms. Mead's gender were so severe and/or pervasive that they created an offensive and demeaning work environment for Ms. Mead, and interfered with her ability to perform her job.

92. FairPoint had actual knowledge of the gender-based harassment because Ms. Mead reported the gender discrimination to FairPoint, as described in this Complaint.

93. In spite of Ms. Mead reporting the gender-based harassment to FairPoint, FairPoint failed to take appropriate remedial action that would have enabled Ms. Mead to continue working without the threat of being subjected to a hostile and inappropriate work environment, as well as the potential for retaliation for reporting the gender-based harassment ,which said retaliation did occur as described in the Complaint.

94. Ms. Mead did not welcome, encourage, or consent to the gender-based harassment to which she was subjected as an employee of FairPoint.

95. The gender-based harassment to which Ms. Mead was subjected as an employee of FairPoint has had, and continues to have, a detrimental effect upon her employment and personal well-being.

96. FairPoint's unlawful employment practices in allowing Ms. Mead to be subjected to gender-based harassment, and in failing to take prompt remedial action to see to it that the gender-based harassment ended, violated New Hampshire RSA 354-A.

97. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count IV – Gender-Based Harassment/Hostile Environment – Title VII

98. Ms. Mead re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

99. As more particularly described in Count III above, FairPoint willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by subjecting Ms. Mead to gender-based harassment (hostile environment) during her employment with FairPoint as described in this Complaint.

100. As a direct and proximate result of FairPoint's violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

### Count V -  Retaliation – RSA 354-A

101. Ms. Mead re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

102. On the heels of Ms. Mead reporting gender-based harassment (hostile environment) and gender discrimination to FairPoint, she was subjected to retaliation ,as described throughout the Complaint, including, but not limited to, (a) continuing gender-based harassment and discrimination, (b) completely failing to consider her for (and therefore, failing to hire her into) Mr. Amburn's position, which she was more qualified to perform than Mr. Rush and which, upon information and belief, paid significantly more than she was earning at FairPoint; (c) demoting her into the position of Senior Vice-President of External Relations and Community High Speed Internet Development, which entirely removed her from Operations at FairPoint; and (d) constructively discharging her from her employment with FairPoint.

103. FairPoint's unlawful retaliation against Ms. Mead for reporting gender discrimination and gender-based harassment (hostile environment) violates N.H. RSA 354-A:7, I.

104. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count VI – Retaliation – Title VII

105. Ms. Mead re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

106. As more particularly described in Count V above, FairPoint willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by retaliating against Ms. Mead for reporting gender discrimination and gender-based harassment (hostile environment) as described in this Complaint.

107. As a direct and proximate result of FairPoint's violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

          Respectfully submitted,

          KAREN MEAD, Plaintiff

          By Her Attorneys

          UPTON & HATFIELD, LLP

Date: August 5, 2015      By: /s/ Heather M. Burns
          Heather M. Burns (NHBA #8799)
          Lauren S. Irwin (NHBA #10544)
          10 Centre Street, PO Box 1090
          Concord, NH 03302-1090
          (603) 224-7791
          hburns@uptonhatfield.com